1  Mark & Shelly Uhrig
2  745 Bailey Dr.
3  Grants Pass, Oregon 97527
4  541-479-1004/jamsuhrig@msn.com

Filed
~~RECVD~~'10 OCT 26 12:41USDC-ORM

5  UNITED STATES DISTRICT COURT

6  DISTRICT OF OREGON

7                                          )
8  **Mark & Shelly Uhrig**                 )    Case# _10 - 3117_ ⌐CL
9  Plaintiff,                              )
10                                         )
11                                         )    **PLAINTIFFS MOTION**
12                                         )    **FOR PRELIMINARY INJUNCTION**
13  vs.                                    )
14                                         )
15                                         )
16  **GMAC MORTGAGE**                      )    Date:_____
17  Defendant                              )
18  _____)

19  Comes now Mark & Shelly  Uhrig, hereinafter referred to as "Petitioner," and moves the court

20  for relief as herein requested:

21                              **PARTIES**

22  Petitioner is Mark & Shelly  Uhrig, 745 Bailey Drive   Grants Pass OR 97527. Currently Known

23  Defendant(s) are/is:  GMAC Mortgage

24                         **STATEMENT OF CAUSE**

25  Petitioner, entered into a consumer contract for the refinance of a primary residence located at

26  745 Bailey Drive  , hereinafter referred to as the "property."

27  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

28  predatory loan agreement with Defendant.

29  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

30  crafted scheme intended to defraud Petitioner.

31  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

32  of the types of tactics used by Defendants to defraud Petitioner.

33  Defendants charged false fees to Petitioner at settlement.

34  Defendants used the above referenced false fees to compensate agents of Petitioner in order to
35  induce said agents to breach their fiduciary duty to Petitioner.

36  Defendant's attorney caused to be initiated collection procedures, knowing said collection
37  procedures in the instant action were frivolous as lender is estopped from collection procedures,
38  under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
39  the production of the original promissory note alleged to create a debt.

40  **IN BRIEF**
41  *(Non-factual Statement of Posture and Position)*

42  It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
43  making a number of allegations that, outside the context of the current condition of the real
44  estate industry, may seem somewhat outrageous and counter-intuitive.

45  When Petitioner accuses ordinary individuals of acting in concert and collusion with an
46  ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
47  unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
48  people, just doing what they have been trained to do, are out to swindle the poor
49  unsuspecting borrower.

50  The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
51  committed by people acting in concert and collusion, one with the other.  Petitioner has no
52  reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
53  that what they were doing was part of an ongoing criminal conspiracy, only that it was,
54  and they, at the very least, kept themselves negligently uninformed of the wrongs they
55  were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
56  courts, for failure to strictly enforce the consumer protection laws.

57  **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
58  *(General State of the Real Estate Industry)*

59  ***THE BEST OF INTENTIONS***

60  Prior to the 1980's and 1990's ample government protections were in place to protect
61  consumers and the lending industry from precisely the disaster we now experience.
62  During President Clinton's administration, under the guise of making housing available to

63    the poor, primary protections were relaxed which had the effect of releasing the

64    unscrupulous on the unwary.

65    Prior to deregulation in the 1980's, lenders created loans for which they held and assumed

66    the risk.  Consequently, Americans were engaged in safe and stable home mortgages.

67    With the protections removed, the unscrupulous lenders swooped in and, instead of

68    making loans available to the poor, used the opportunity to convince the unsophisticated

69    American public to do something that had been traditionally taboo; home buyers were

70    convinced to speculate with their homes, their most important investment.

71    GMAC Mortgage , Ameriquest, Countrywide, and many others swooped in and

72    convinced Americans to sell their homes, get out of their safe mortgage agreements, and

73    speculate with the equity they had gained by purchasing homes they could not afford.

74    Lenders created loans intended to fail as, under the newly crafted system, the Lender

75    profited more from a mortgage default than from a stable loan.

76    Companies cropped up who called themselves banks when, in fact, they were only either

77    subsidiaries of banks, or unaffiliated companies that were operated for the purpose of

78    creating and selling promissory notes.  As will be demonstrated, these companies then

79    profited from the failure of the underlying loans.

80    ***HOW IT WORKS***

81    Briefly, how it works is this, the Lender would secure a large loan from a large bank,

82    convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an

83    investor.

84    People would set up mortgage companies by securing a large loan from one of the major

85    banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this

86    an Agent would contract with a seller to find a buyer, bring both seller and buyer to a

87    lender who would secure the title from the seller using the borrowed bank funds for that

88    purpose, and then trade the title to the buyer in exchange for a promissory note.

89    The lender then creates a 20 or 30 year mortgage with money the lender must repay within

90    6 months.  As soon as the closing is consummated, the promissory note is sold to an

91    investor pool.

92    Using the instant case as an example, a \$229,000.00 note at 6.5980%%  interest over 30

93    years will produce \$127,224.84    The lender can then offer to the investor the security

94    instrument (promissory note) at say 50% of it's future value. The investor will, over the
95    life of the note, less approximately 3.00% servicing fees, realize $276,978.03 . The lender
96    can then pay back the bank and retain a handsome profit in the amount of $65,110.69. The
97    lender, however, is not done with the deal.

98    The lender signed over the promissory note to the investor at the time of the trade, but did
99    not sign over the lien document (mortgage or deed of trust). The State of Kansas Supreme
100   Court addressed this issue and stated that such a transaction was certainly legal. However,
101   it created a fatal flaw as the holder of the lien document, at time of sale of the security
102   instrument, received consideration in excess of the lien amount. Since the lien holder
103   received consideration, he could not be harmed. Therefore the lien became an
104   unenforceable document.

105   This begs the question: if keeping the lien would render it void, why would the lender not
106   simply transfer the lien with the promissory note? The reason is because the lender will
107   hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
108   amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
109   liability. The lender, by this maneuver, gets consideration a second time. And still the
110   lender is not done profiting from the deal.

111   After sale of the promissory note, the lender remains as the servicer for the investor. The
112   lender will receive 3% of each payment the lender collects and renders to the investor
113   pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
114   that amount. Also, if the loan defaults, the lender stands to gain thousands for handling the
115   foreclosure.

116   The lender stands to profit more from a note that is overly expensive, than from a good
117   stable loan. And where, you may ask, does all this profit come from? It comes from the
118   equity the borrower had built up in the home. And still the lender is not finished profiting
119   from the deal.

120   Another nail was driven in the American financial coffin when on the last day Congress
121   was in session in 2000 when restrictions that had been in place since the economic
122   collapse of 1907 were removed. Until 1907  investors were allowed to bet on stocks
123   without actually buying them. This unbridled speculation led directly to an economic
124   collapse. As a result the legislature banned the practice, until the year 2000. In 2000 the
125   unscrupulous lenders got their way on the last day of the congressional session. Congress

126  removed the restriction banning derivatives and again allowed the practice, this time
127  taking only 8 years to crash the stock market.   This practice allowed the lender to profit
128  further from the loan by betting on the failure of the security instrument he had just sold to
129  the unwary investor, thus furthering the purpose of the lender to profit from both the
130  borrower (consumer) and the investor.

131  The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
132  bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
133  accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
134  were acting under the guise of government regulation and, therefore, the borrower had
135  reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
136  protect the consumer from just this kind of abuse were simply being ignored.

137  The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
138  the referral of the client to the lender by a person acting as an agent for the borrower.
139  Hereinafter, the person or entity who receives any portion of the yield spread premium, or
140  a commission of any kind consequent to securing the loan agreement through from the
141  borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
142  law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
143  seeking out a lender for the borrower, would seek the best deal for his client rather than
144  who would pay him the most.  That was the intent, but not the reality.  The reality is that
145  Agents never come away from the table with less than 2% or 3% of the principal.  This is
146  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
147  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
148  product than the borrower qualifies for.  This will generate more profits for the lender and,
149  consequently, for the Agent.

150  It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
151  the fair market price.  This allows the lender to increase the cost of the loan product and
152  give the impression that the borrower is justified in making the purchase.

153  The lender then charges the borrower an underwriting fee in order to convince the
154  borrower that someone with knowledge has gone over the conditions of the note and
155  certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
156  deception of the borrower by placing undue stress on the borrower to sign the large stack
157  of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to
158  insure the transaction.  This trust is systematically violated for the purpose of taking unfair

159  advantage of the borrower.  The entire loan process is a carefully crafted contrive
160  connivance designed and intended to induce the unsophisticated borrower into accepting a
161  loan product that is beyond the borrowers means to repay.  With all this, it should be a
162  surprise to no one that this country is having a real estate crisis.

163  ### PETITIONER WILL PROVE THE FOLLOWING
164  Petitioner is prepared to prove, by a preponderance of evidence that:

165  • Lender has no legal standing to bring collection or foreclosure claims against the
166  property;

167  • Lender is not a real party in interest in any contract which can claim a collateral
168  interest in the property;

169  • even if Lender were to prove up a contract to which Lender had standing to enforce
170  against Petitioner, no valid lien exists which would give Lender a claim against the
171  property;

172  • even if Lender were to prove up a contract to which Lender had standing to enforce
173  against Petitioner,  said contract was fraudulent in its creation as endorsement was
174  secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
175  the inducement, fraud in the execution, usury, and breaches of contractual and
176  fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
177  Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
178  Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
179  "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
180  'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
181  bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
182  pooled together in a trust fund;

183  • Defendants have concocted a carefully crafted connivance wherein Lender
184  conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
185  by inducing Plaintiff to enter into a predatory loan inflated loan product;

186  • Lender received unjust enrichment in the amount of 5% of each payment made late
187  to Lender while Lender and Lender's assigns acted as servicer of the note;

188      •   Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
189          handling the foreclosure process on a contract Lender designed to have a high
190          probability of default;

191      •   Lender intended to defraud Investor by converting the promissory note into a
192          security instrument and selling same to Investor;

193      •   Lender intended to defraud Investor and the taxpayers of the United States by
194          withholding the lien document from the sale of the promissory note in order that
195          Lender could then hold the lien for three years, then prepare and file Internal
196          Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
197          and deduct same from Lender's income tax obligation;

198      •   Lender defrauded backers of derivatives by betting on the failure of the promissory
199          note the lender designed to default;

200      •   participant Defendants, et al, in the securitization scheme described herein have
201          devised business plans to reap millions of dollars in profits at the expense of
202          Petitioner and others similarly situated.

### PETITIONER SEEKS REMEDY

204 In addition to seeking compensatory, consequential and other damages, Petitioner seeks
205 declaratory relief as to what (if any) party, entity or individual or group thereof is the
206 owner of the promissory note executed at the time of the loan closing, and whether the
207 Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
208 Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
209 alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

### *PETITIONER HAS BEEN HARMED*

211 Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

212 Such harm and detriment includes economic and non-economic damages, and injuries to
213 Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

214 In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
215 equitable relief requested herein is granted.

216                              **STATEMENT OF CLAIM**

217          *DEFENDANTS LACK STANDING*

218                 **No evidence of Contractual Obligation**

219     Defendants claim a controversy based on a contractual violation by Petitioner but have failed to

220     produce said contract.  Even if Defendants produced evidence of the existence of said contract in

221     the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence

222     that a contract actually existed at one point in time.  A copy, considering the present state of

223     technology, could be easily altered.  As Lender only created one original and that original was

224     left in the custody of Lender, it was imperative that Lender protect said instrument.

225     In as much as the Lender is required to present the original on demand of Petitioner, there can be

226     no presumption of regularity when the original is not so produced.   In as much as Lender has

227     refused Petitioner's request of the chain of custody of the security instrument in question by

228     refusing to identify all current and past real parties in interest, there is no way to follow said

229     chain of custody to insure, by verified testimony, that no alterations to the original provisions in

230     the contract have been made.   Therefore, the alleged copy of the original is only hearsay

231     evidence that an original document at one time existed.  Petitioner maintains that, absent

232     production of admissible evidence of a contractual obligation on the part of Petitioner,

233     Defendants are without standing to invoke the subject matter jurisdiction of the court.

234                 **No Proper Evidence of Agency**

235     Defendants claim agency to represent the principal in a contractual agreement involving

236     Petitioner, however, Defendants have failed to provide any evidence of said agency other than a

237     pronouncement that agency has been assigned by some person, the true identity and capacity of

238     whom has not been established.  Defendants can hardly claim to be agents of a principal then

239     refuse to identify said principal.  All claims of agency are made from the mouth of the agent with

240     no attempt to provide admissible evidence from the principal.

241     Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the

242     court.

243            **Special Purpose Vehicle**

244    Since the entity now claiming agency to represent the holder of the security instrument is not the

245    original lender, Petitioner has reason to believe that the promissory note, upon consummation of

246    the contract, was converted to a security and sold into a special purpose vehicle and now resides

247    in a Real Estate Mortgage Investment Conduit (REMIC)    as defined by the Internal Revenue

248    Code and as such, cannot be removed from the REMIC as such would be a prohibited

249    transaction.    If the mortgage was part of a special purpose vehicle and was removed on

250    consideration of foreclosure, the real party in interest would necessarily be the trustee of the

251    special purpose vehicle.  Nothing in the pleadings of Defendants indicates the existence of a

252    special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner

253    cause to believe defendant is not the proper agent of the real party in interest.

254    ***CRIMINAL CONSPIRACY AND THEFT***

255    Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward

256    a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of

257    negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous

258    acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to

259    Petitioner by Lender, which were then used to fund the improper payment of commission fees to

260    Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

261    ***AGENT PRACTICED UP-SELLING***

262    By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so

263    doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact

264    that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose

265    Agent's conspiratorial relationship to Lender,  Agent violated Agent's fiduciary duty to

266    Petitioner and the duty to provide fair and honest services, through a series of carefully crafted

267    connivances, wherein Agent proactively made knowingly false and misleading statements of

268    alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead

269    Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of

270    a loan product offered by the Lender.  Said loan product was more expensive than Petitioner

271    could legally afford. Agent acted with full knowledge that Petitioner would have made a

272    different decision had Agent given complete disclosure.

273    ### *FRAUDULENT INDUCEMENT*

274    Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
275    known, Petitioner could not afford in order to unjustly enrich Lender.

276    ### *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

277    Said more expensive loan product was calculated to produce a higher return when sold as a
278    security to an investor who was already waiting to purchase the loan as soon as it could be
279    consummated.

280    ### **Extra Commission for Late Payments**

281    Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
282    that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
283    the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
284    borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
285    Thereby, the Lender stands to receive more than double the regular commission on collections if
286    the borrower pays late.

287    ### **Extra Income for Handling Foreclosure**

288    Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
289    on which Lender intended petitioner to default.  In case of default, the Lender, acting as servicer,
290    receives considerable funds for handling and executing the foreclosure process.

291    ### **Credit Default Swap Gambling**

292    Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
293    default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
294    designed the loan to fail, betting on said failure is essentially a sure thing.

295    ### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

296    Lender sold the security instrument after closing and received consideration in an amount in
297    excess of the lien held by Lender.  Since Lender retained the lien document upon the sale of the
298    security instrument, Lender separated the lien from said security instrument, creating a fatal and
299    irreparable flaw.

300 When Lender received consideration while still holding the lien and said consideration was in
301 excess of the amount of the lien, Lender was in a position such that he could not be harmed and
302 could not gain standing to enforce the lien.  The lien was, thereby, rendered void.

303 Since the separation of the lien from the security instrument creates such a considerable concern,
304 said separation certainly begs a question: "Why would the Lender retain the lien when selling the
305 security instrument?"

306 When you follow the money the answer is clear.  The Lender will hold the lien for three years,
307 then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
308 the full amount from Lender's tax liability, thereby, receiving consideration a second time.

309 Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
310 lien to the holder of the security, however, the lien once satisfied, does not gain authority just
311 because the holder, after receiving consideration, decides to transfer it to someone else.

312 ***LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES***

313 Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
314 information that Lender had as a result of creating the faulty loans sure to default.  Lender was
315 then free to invest on the bet that said loan would default and stood to receive unjust enrichment
316 a third time.  This credit default swap derivative market scheme is almost totally responsible for
317 the stock market disaster we now experience as it was responsible for the stock market crash in
318 1907.

319 ***LENDER CHARGED FALSE FEES***

320 Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
321 Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
322 vendor.

323 Lender charged other fees that were a normal part of doing business and should have been
324 included in the finance charge.

325 Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
326 did Lender or Trustee provide documentation to show that the fees herein listed were valid,
327 necessary, reasonable, and proper to charge Petitioner.

| | | |
|---|---|---|
| 803 | Appraisal | $450.00 |
| 804 | Credit Report | $17.28 |
| 808 | Loan Fee | $640.00 |
| 810 | Loan Origination Fee | $1,000.04 |
| 811 | Promissory Fee | $295.00 |
| 901 | Interest from 9/21/06 to 10/01/06 @ $40.7808000/day | $407.81 |
| 1001 | Hazard Insurance | $222.90 |
| 1003 | City Property Taxes | $1,943.89 |
| 1101 | Settlement fee | $205.00 |
| 1103 | Endorsement 8,1,9,116-2nd Loan | $100.00 |
| 1104 | Email DocFee-2nd | $25.00 |
| 1105 | Email Doc Fee | $25.00 |
| 1106 | Supplemental Summary | $375.00 |
| 1108 | Title Insurance | $1,127.00 |
| 1111 | Wire Fee-2nd Loan | $15.00 |
| 1112 | Loan Packaging Fee-2nd Loan | $50.00 |
| 1113 | Escrow/Closing Fee-2nd Loan | $75.00 |
| 1201 | Recording Fee | $96.00 |
| 1303 | Credit Payment | $13,017.00 |
| 1304 | Credit Payment | $11,773.00 |
| 1305 | Credit Payment | $6,329.00 |
| 1306 | Credit Payment | $5,935.00 |
| 1307 | Credit Payment | $562.00 |

328   Debtor is unable to determine whether or not the above fees are valid in accordance with the

329   restrictions provided by the various consumer protection laws.  Therefore, please provide; a

330   complete billing from each vendor who provided the above listed services; the complete contact

331   information for each vendor who provided a billed service; clearly stipulate as to the specific

332   service performed; a showing that said service was necessary; a showing that the cost of said

333   service is reasonable; a showing of why said service is not a regular cost of doing business that

334   should rightly be included in the finance charge.

335   The above charges are hereby disputed and deemed unreasonable until such time as said charges

336   have been demonstrated to be reasonable, necessary, and in accordance with the limitations and

337   restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

338   In the event lender fails to properly document the above charges, borrower will consider same as

339   false charges.  The effect of the above amounts that borrower would pay over the life of the note

340   will be an overpayment of $214,863.88  This amount will be reduced by the amount of items

341   above when said items are fully documented.

342   ***RESPA PENALTY***

343   From a cursory examination of the records, with the few available, the apparent RESPA

344   violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In

345   Lending Statement not within limits compared to Note, Truth in Lending Statement not timely

346   presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
347   No 1st Payment Letter.

348    The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
349   Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
350   statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
351   disclosure letter; loan discount fee disclosure; business insurance company arrangement
352   disclosure; notice of right to rescind.

353   The courts have held that the borrower does not have to show harm to claim a violation of the
354   Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
355   in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
356   no more than two thousand, considering the large number enumerated here, it is reasonable to
357   consider that the court will assess the maximum amount for each violation.

358   Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
359   the note, borrower has calculated that, the number of violations found in a cursory examination
360   of the note, if deducted from the principal, would result in an overpayment on the part of the
361   borrower, over the life of the note, of $218,974.76.

362   If the violation penalty amounts for each of the unsupported fees listed above are included, the
363   amount by which the borrower would be defrauded is $185,993.52

364   Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
365   variance, it appears that lender intended to defraud borrower in the amount of $620,655.26

366   ***LENDER CONSPIRED WITH APPRAISER***

367   Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
368   purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
369   duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
370   inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
371   Petitioner.

372   ***LENDER CONSPIRED WITH TRUSTEE***

373   Lender conspired with the trust Agent at closing to create a condition of stress for the specific
374   purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
375   fully understand what was being signed.

376   The above referenced closing procedure was a carefully crafted connivance, designed and
377   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
378   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
379   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
380   as required by various consumer protection statutes.

381   ### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

382   In the manner in which Defendants have carried on their business enterprises, they have engaged
383   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
384   (Deceptive Practices Act).

385   Such conduct comprises a pattern of business activity within the meaning of such statutes, and
386   has directly and proximately caused Petitioner to suffer economic and non-economic harm and
387   detriment in an amount to be shown according to proof at trial of this matter.

388   ### *EQUITABLE TOLLING FOR TILA AND RESPA*

389   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
390   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

391   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
392   *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
393   are subject to a one-year limitations period; however, such claims are subject to the equitable
394   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
395   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
396   that given the remedial purpose of TILA, the limitations period should run from the date of
397   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
398   circumstances, suspend the limitations period until the borrower discovers or has reasonable
399   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
400   *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

401   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
402   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
403   that such limitations period may be equitably tolled. The Court of Appeals for the District of
404   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
405   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the

406 opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
407 *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
408 that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
409 *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
410 *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
411 interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
412 language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
413 of precedential value, this Court has previously found both the TILA and **RESPA** limitations
414 periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
415 *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

416 The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
417 by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
418 existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
419 *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
420 Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
421 any wrongful conduct by the Defendants. Santa Maria. at 1178.

422 ### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
423 ### *STANDARDS*

424 Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
425 assets by, for example, providing W-2 statements, tax returns, bank statements, documents
426 evidencing title, employment information, and other information and documentation that could
427 be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
428 ability to repay a particular loan over both the short and long term. Defendants deviated from and
429 disregarded these standards, particularly with regard to its riskier and more profitable loan
430 products.

431 **Low-Documentation/No-Documentation Loans.**

432 Driven by its desire for market share and a perceived need to maintain competitiveness with the
433 likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
434 documentation loan products, including the ARMs and HELOCs described hereinabove, and
435 began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
436 the already eased underwriting standards to the point of disregarding such standards. This

437  quickened the loan origination process, allowing for the generation of more and more loans
438  which could then be resold and/or securitized in the secondary market.

439  Defendants marketed no-documentation/low-documentation loan programs that included ARMs
440  and HELOCs, among others, in which loans were given based on the borrower's "stated income"
441  or "stated assets" (SISA) neither of which were verified. Employment was verbally confirmed, if
442  at all, but not further investigated, and income, if it was even considered as a factor, was to be
443  roughly consistent with incomes in the types of jobs in which the borrower was employed. When
444  borrowers were requested to document their income, they were able to do so through information
445  that was less reliable than in a full-documentation loan.

446  For stated income loans, it became standard practice for loan processors, loan officers and
447  underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
448  income loans, emphasizing loan origination from a profitability standpoint at the expense of
449  determining the ability of the borrower to repay the loan from an underwriting standpoint,
450  encouraged the overstating and/or fabrication of income.

451  **Easing of Underwriting Standards**

452  In order to produce more loans that could be resold in the secondary mortgage market,
453  Defendants also relaxed, and often disregarded, traditional underwriting standards used to
454  separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
455  the base FICO score needed for a SISA loan.

456  Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
457  used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
458  loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
459  income ratios (the amount of monthly income compared to monthly debt service payments and
460  other monthly payment obligations.

461  With respect to ARMS, Defendants underwrote loans without regard to the borrower's long-term
462  financial circumstances, approving the loan based on the initial fixed rate without taking into
463  account whether the borrower could afford the substantially higher payment that would
464  inevitably be required during the remaining term of the loan.

465  With respect to HELOCs, Defendants underwrote and approved such loans based only on the
466  borrower's ability to afford the interest-only payment during the initial draw period of the loan,

467     rather than on the borrower's ability to afford the subsequent, fully amortized principal and
468     interest payments.

469     As Defendants pushed to expand market share, they eased other basic underwriting standards.
470     For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
471     allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. <u>At the same time that they</u>
472     <u>eased underwriting standards the Defendants also were encouraging consumers to go further into</u>
473     <u>debt in order to supply the very lucrative aftermarket of mortgage backed securities.  The relaxed</u>
474     <u>underwriting standards created the aftermarket supply they needed. As a result, the Defendants</u>
475     <u>made it easy for the unwary consumer to take on more debt than he could afford by encouraging</u>
476     <u>unsound financial practices, all the while knowing defaults would occur more and more</u>
477     <u>frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting</u>
478     <u>standards.</u>

479     Defendants knew, or in the exercise of reasonable care should have known, from its own
480     underwriting guidelines industry standards that it was accumulating and selling/reselling risky
481     loans that were likely to end up in default. However, as the pressure mounted to increase market
482     share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
483     underwriting guidelines. Such was the environment that loan officers and underwriters were,
484     from time to time, placed in the position of having to justify why they did not approve a loan that
485     failed to meet underwriting criteria.

486     **Risk Layering**

487     Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
488     loans with one or more relaxed underwriting standards.

489     Defendants knew, or in the exercise of reasonable care should have known, that layered risk
490     would increase the likelihood of default. Among the risk layering Defendants engaged in were
491     approving ARM loans with little to no down payment, little to no documentation, and high
492     DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
493     the loans it promoted to borrowers.

494     Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
495     mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
496     believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did

497  business ignored basic established underwriting standards and acted to mislead the borrower, all
498  to the detriment of the borrower and the consumer of loan products..

499  Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
500  engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
501  business practices described above in paragraphs 30-42 of this Complaint

502    *UNJUST ENRICHMENT*

503  Petitioner is informed and believes that each and all of the Defendants received a benefit at
504  Petitioner's expense, including but not limited to the following: To the Agent, commissions,
505  yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
506  be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
507  surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
508  resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
509  percentages of payment proceeds, charges, and other "back end" payments in amounts to be
510  proved at trial; To all participants, the expectation of future revenues from charges, penalties and
511  fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

512  By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
513  and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
514  deprived, and is entitled to restitution in the amount of $620,655.26

515    *CLAIM TO QUIET TITLE.*

516  Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
517  the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
518  interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
519  and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

520  Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
521  power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
522  interest in the Subject Property has been rendered void and that the Defendants are not the holder
523  in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
524  involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

525    "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
526    scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
527    *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
528    *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
529    *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
530    *Rptr. 2d 752 (2d Dist. 1995).*

531    ### SUFFICIENCY OF PLEADING

532    Petitioner has sufficiently pled that relief can be granted on each and every one of the
533    Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
534    doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
535    entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
536    allegations of material fact in the complaint are taken as true and construed in the light most
537    favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

538    Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
539    8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
540    theories, and seeks remedies to which Petitioner is entitled.  *Balistreri v. Pacifica Police Dept., 901 F.2d*
541    *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
542    conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
543    should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
544    Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
545    their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
546    relief as requested herein should be granted.

547    ### CAUSES OF ACTION

548    ### BREACH OF FIDUCIARY DUTY

549    Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
550    duty of care with respect to the mortgage loan transactions and related title activities involving
551    the Trust Property.

552    Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
553    breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
554    all applicable laws governing the loan transactions in which they were involved, including but
555    not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

556   Defendant's breaches of said duties were a direct and proximate cause of economic and non-
557   economic harm and detriment to Petitioner(s).

558   Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
559   all to be shown according to proof at trial of this matter.

560   *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

561   Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
562   duty to properly perform due diligence as to the loans and related transactional issues described
563   hereinabove.

564   In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
565   X and Z promulgated there under to, among other things, provide proper disclosures concerning
566   the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
567   or should have known that borrowers could not afford or maintain, and to avoid paying undue
568   compensation such as "yield spread premiums" to mortgage Agents and loan officers.

569   Defendants knew or in the exercise of reasonable care should have known, that the loan
570   transactions involving Petitioner and other persons similarly situated were defective, unlawful,
571   violative of federal and state laws and regulations, and would subject Petitioner to economic and
572   non-economic harm and other detriment.

573   Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
574   Z promulgated there under were intended and designed to protect, and the conduct alleged
575   against Defendants is the type of conduct and harm which the referenced statutes and regulations
576   were designed to deter.

577   As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
578   non-economic harm in an amount to be shown according to proof at trial.

579   *AGENT: COMMON LAW FRAUD*

580   If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
581   negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
582   ground for believing them to be true.

583  Agents made these representations with the intention of inducing Petitioner to act in reliance on
584  these representations in the manner hereafter alleged, or with the expectation that Petitioner
585  would so act.

586  Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
587  in their negligent misrepresentation, and that various Agents were negligent in not implementing
588  procedures such as underwriting standards oversight that would have prevented various Agents
589  from facilitating the irresponsible and wrongful misrepresentations of various Agents to
590  Defendants.

591  Petitioner is informed and believes that Agent acted in concert and collusion with others named
592  herein in promulgating false representations to cause Petitioner to enter into the LOAN without
593  knowledge or understanding of the terms thereof.

594  As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
595  Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
596  opportunities, attorney fees and costs, and other damages to be determined at trial. As a
597  proximate result of Agents' breach of duty and all other actions as alleged herein, Plaintiff has
598  suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
599  mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
600  at trial.

601  ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
602  ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

603  Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
604  fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
605  performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
606  *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
607  *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
608  *Jones, (2004) 33 Cal. 4th 917,* the court stated:

609  In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
610  particular significance, in part because of the special relationship between the insurer and the
611  insured. The insurer, when determining whether to settle a claim, must give at least as much

612   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
613   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

614   Likewise, there is a special relationship between an Agent and borrower. "A person who
615   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
616   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
617   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
618   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
619   *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
620   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
621   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
622   [*Emphasis Added*].

623   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
624   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
625   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
626   product without regard for other more affordable products; (4) Placed Petitioner into a loan
627   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
628   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
629   valid and /or properly documented substitutions and assignments so that Petitioner could
630   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
631   request for documentation of the servicing of Petitioner's loan and the existence and content of
632   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
633   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
634   right under an alleged power of sale because the purported assignment was not recorded and by
635   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
636   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
637   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

638   ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
639   ***SEQ***

640   Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
641   contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
642   Action as though the same were set forth herein.

643  Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
644  the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
645  Property, and entitles Petitioner to damages as proven at trial.

646  ### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

647  The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
648  highly leveraged and vulnerable consumers who placed their faith and trust in the superior
649  knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
650  civilized society.

651  Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
652  distress, or acted in conscious and/or reckless disregard of the probability that such distress
653  would occur.

654  Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
655  conduct of Defendants as described hereinabove.

656  As a result of such severe emotional distress, Petitioner suffered economic and non economic
657  harm and detriment, all to be shown according to proof at trial of this matter.

658  Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
659  Petitioner and secure to Petitioner quite title;

660  Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
661  as payments to Defendants based on the fraudulently secured promissory note in an amount to be
662  calculated by Defendants and verified to Petitioner;

663  Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
664  amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
665  equal to $1,861,965.78

666  ### REQUEST FOR TEMPORARY INJUNCTION

667  Plaintiff will suffer imminent and irreparable injury if defendant is not enjoined from
668  foreclosing on the property owned by Plaintiff. Fed. R. Civ. P. 65(b)(1); *see Sampson v. Murray*,
669  415 U.S. 61, 88-89 & n.59, 94 S. Ct. 937, 951-52 & n.59 (1974).

670  There is no adequate remedy at law because once the foreclosure sale has taken place
671  Plaintiff will suffer the complete loss of the property as defendant will sell the property to a third

672  party who will have a right to possession without regard to the claims Plaintiff has against
673  defendant. {*See N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306, 105 S.*
674  *Ct. 459, 459 (1984); Wilson v. Ill. S. Ry. Co., 263 U.S. 574, 576-77, 44 S. Ct. 203, 203-04*
675  *(1924); Winston v. Gen. Drivers, Warehousemen & Helpers Local Un. No. 89, 879 F. Supp. 719,*
676  *725 (W.D. Ky. 1995.*

677      There is a substantial likelihood that plaintiff will prevail on the merits. *Schiavo v. Schiavo,*
678  403 F.3d 1223, 1225 (11th Cir. 2005). Plaintiff will be able to show that:

679      • that the alleged real party in interest is unable to prove standing to foreclose against
680          and sell the property;

681      • Defendant has no agency to represent the real party in interest;

682      • that the lender committed numerous acts, as listed above, that have the effect of
683          rendering the contract, through which defendant claims authority, void and
684          unenforceable.

685      The threatened harm to plaintiff outweighs the harm that a preliminary injunction would
686  inflict on defendant. *Schiavo,* 403 F.3d at 1225-26. If defendant is temporarily restrained from
687  selling the instant property, the defendant and plaintiff will benefit as if plaintiff is forced to
688  vacate the property, the property will sit empty for the duration of the action. Plaintiff will suffer
689  loss of the use of said property and will loose opportunity to maintain same and defendant will
690  suffer loss by having to maintain an empty property that cannot be insured.

691      Issuance of a preliminary injunction would not adversely affect the public interest and public
692  policy because there are already a great number of empty houses with the current residential
693  foreclosure mess. Adding more will simply increase the burden on the local as it will create
694  opportunity for vandalism and further other criminal activity.

695      Plaintiff is willing to post a bond in the amount the court deems appropriate.

696      The court should enter this preliminary injunction without notice to defendant because
697  plaintiff will suffer immediate and irreparable injury, loss, or damage if the order is not granted
698  before defendant can be heard as **defendant has made it clear that sale and eviction are**
699  **imminent.** *First Tech. Safety Sys. v. Depinet,* 11 F.3d 641, 650 (6th Cir. 1993). If said sale is

700 allowed to take place, Plaintiff will be irreparably harm.   {*See O'Connor's Federal Rules, "Ex*
701 *parte," ch. 2-D, §3.1.3, p. 77.*}

702     Plaintiff asks the court to set the request for a preliminary injunction for hearing at the
703 earliest possible time.

## CONCLUSION

704
705     13. Plaintiff has filed suit against defendant wherein Plaintiff has claimed numerous causes
706 of action against defendant.  A number of the allegations made by Plaintiff are incontrovertable
707 by defendant, therefore, Plaintiff will prevail on a number of the above allegations by way if
708 existing records.  For these reasons, plaintiff asks the court to issue a preliminary injunction
709 preventing defendant from foreclosing on the property.

## PRAYER

710
711     15. For these reasons, plaintiff asks that the court do the following:

712     a.   Defendant be prevented from foreclosing on and selling the property until and
713          unless defendant prevails in the current litigation.

714     b.   Enter judgment for plaintiff.

715     c.   Award costs of court.

716     d.   Grant any other relief it deems appropriate.

717 **Respectfully Submitted,**
718
719
720 **Mark Uhrig**                  **Shelly Uhrig**
721

# VERIFICATION

722

723

724

725  I, Mark & Shelly Uhrig, do swear and affirm that all statements made herein are true and
726  accurate, in all respects, to the best of my knowledge.

727  Mark & Shelly Uhrig
728  745 Bailey Drive
729  Grants Pass, OR
730
731
732  _____              _____
733  Mark Uhrig                           Shelly Uhrig
734
735
736  The Person above, who proved to me on the basis of satisfactory evidence to be the person

737  whose name is subscribed to this document and acknowledged to me that he/she executed the

738  same in his authorized capacity and that by his signature on this instrument who is the person

739  who executed this instrument.

740  I certify under PENALTY OF PERJURY under the laws of this State that the foregoing

741  paragraph is true and correct.

742

743  Witness my hand and official seal.

OFFICIAL SEAL
CHARLOTTE THOMPSON
NOTARY PUBLIC - OREGON
COMMISSION NO. 412892
MY COMMISSION EXPIRES DECEMBER 21, 2010

744

745  _____

746  **NOTARY PUBLIC IN AND FOR**          **Notary Seal**

747  **THE STATE OF OREGON**

748